**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

FILED ENTERED
LODGED RECEIVED
APR 2 2025
AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY DEPUTY

**Adam Wood,**
302 Hibiscus Street
Taneytown, MD 21787
**Plaintiff,**

v.

EA 25CV1104

**United States of America,**
(Federal Bureau of Investigation, Department of Justice)
**Defendant.**

**Civil Action No. ____________**

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

Plaintiff Adam Wood, by and for his complaint against Defendant United States of America, alleges as follows:

**INTRODUCTION**

1. This is an action under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-2680, and related constitutional and statutory claims, arising out of an unlawful, unsubstantiated, and egregiously negligent FBI raid of Plaintiff's home and life on February 7, 2024.
2. Plaintiff brings this action seeking damages for negligence, tortious interference with business and contractual relations, intentional infliction of emotional distress, civil rights violations, and promissory estoppel committed by employees of the Federal Bureau of Investigation (FBI) acting under the color of law.
3. Plaintiff further seeks damages under Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971), for constitutional violations of his Fourth, Fifth, and Sixth Amendment rights.

**JURISDICTION AND VENUE**

4. This Court has jurisdiction under 28 U.S.C. § 1346(b)(1), as this is a civil action against the United States for money damages for personal injury caused by the negligent or wrongful act or omission of federal employees.

5. Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1402(b), as the acts and omissions giving rise to the claims occurred in this district and Plaintiff resides here.
6. Plaintiff has complied with, and exhausted, all administrative prerequisites under the FTCA. Two (2) Inspector General referrals have been filed with the Department of Justice dated April 23, 2024, and January 26, 2025. An SF-95 was filed on October 1, 2024, and the FBI acknowledged receipt on January 30, 2025. As of filing, no resolution has been offered and the six-month statutory period under 28 U.S.C. § 2675(a) has expired.

**PARTIES**

7. Plaintiff Adam Wood is a U.S. citizen residing in Taneytown, Maryland. He is an honorably discharged Navy veteran, a graduate of both Harvard University and Tufts University, former professor and fellow of Johns Hopkins University and Harvard Law School and a national security professional with years of government, sports and entertainment industry, and international institution collaboration at the highest levels.
8. Defendant United States of America is sued under the FTCA for acts and omissions of its employees acting within the scope of their federal employment, specifically agents and officials of the FBI and Department of Justice.

**FACTUAL ALLEGATIONS**

9. On February 7, 2024, agents from the FBI's Boston and Baltimore Field Offices raided Plaintiff's home in Maryland in a pre-dawn (6am EST), military-style operation.
10. The raid was predicated on unfounded speculation, demonstrably false assumptions, and zero corroboration from FBI Headquarters, FBI Cyber Division, FBI Intelligence Branch (FBI IB), the National Cyber Investigative Joint Task Force (NCIJTF) or any qualified subject matter experts with whom the Plaintiff had been coordinating efforts to support the security of United States Government and its citizens since 2021. These efforts included CI assessments requested by FBI leadership at the WFO/FBI HQ at the Senior Executive-level and were successfully completed by the Plaintiff's company, SST.
11. Agents failed to verify Plaintiff's extensive work with FBI HQ, ODNI, NSA, CIA, DIA, NGA, NRO, DOD, DHS, Department of Commerce, and the Department of Energy stating that, "The history" relative to the Plaintiff's past work with the government including extensive vetting "did not matter."
12. Agents failed to research the Plaintiff's company website, which included former members of President Trump and President Biden's National Security Council (NSC), Command Senior Enlisted Leader (CSEL) of NSA/CYBERCOM, DIA, and SPACECOM, General Officers from United States Army Special Operations Command (USASOC), and SIS-4 from CIA.

13. Agents failed to research the Plaintiff's military and education background visible on a variety of mediums including but not limited to, the company website, LinkedIn, YouTube, Google, and the official websites of the Department of Defense and United States Navy.
14. Agents failed to research public media releases demonstrating the Plaintiff actively engaging in sanctioned activities with General Fenton, CG SOCOM, General Donahue, GC 18th Airborne Corps and 82nd Airborne, and the ODNI.
15. Agents failed to research Plaintiff's frequent engagements at the Pentagon, COCOMs, and other cleared spaces with interagency partners.
16. Agents ignored years of authorized national security collaboration. Agents ignored Plaintiff's willingness to facilitate introductions to the aforementioned parties, including the Special Advisor for Cybersecurity to former FBI Director, Christopher Wray, to verify collaboration to minimize the extent of damages.
17. Special Agent Paul Garaffo of the Boston Field Office repeatedly acknowledged he had not coordinated with FBI HQ or verified intelligence with the Cyber Division, FBI IB, NCIJTF, claiming the raid was a "fact-finding" mission, which runs counter to proper FBI protocol.
18. During the two-hour long (7am - 9am) interrogation portion of the raid, SA Garaffo stated he was "110% confident the intelligence was fake," without having reviewed the evidence or spoken to subject matter experts or any qualified personnel within and across his own Agency, the Federal Bureau of Investigation. When the technology was further explained, SA Garaffo pivoted, stating that the technology was "dangerous" despite the FBI HQ/WFO having leveraged that technology to prevent attacks on members of Congress - both Republican and Democrat.
19. Information about the investigation was leaked to civilians as early as August 2023, in violation of national security law and internal FBI protocols. A witness who was prepared to invest $2 million into Plaintiff's company later disclosed this classified investigation—despite not being law enforcement—resulting in immediate withdrawal of the investment. This disclosure directly and measurably cost Plaintiff's company $2 million in capital.
20. No charges were filed. No probable cause ever existed. No explanation, apology, or redress has been provided despite the passage of over 419 days.
21. Plaintiff's professional trajectory and business operations were irreparably disrupted as a direct result of the FBI's actions. His business, Special Support Technologies (SST), collapsed. Multiple U.S. government agencies abandoned planned contracts and pilots, including the Department of Defense, Department of Commerce, and MARFORCYBER.
22. One such pilot program with the Department of Commerce was valued at $850,000 for a single month and was scheduled for Q1 2024. The follow-on acquisition potential from this program was estimated between $10 million to $12 million annually. The destruction

of this pipeline caused immediate and long-term economic harm to Plaintiff and his company.

23. The FBI's conduct resulted in strategic sabotage of U.S. national security innovation. The Chief Technology Officer of the U.S. Navy had formally expressed intent to bring SST into Horizon 1 ($30M/year enterprise-wide) or Horizon 2 ($15M/year service-wide) programs of record. Additionally, MARFORCYBER transmitted written verification of its intent to deploy SST's proprietary technologies in a Global Shaping Operation across all Combatant Commands (COCOMs). These unprecedented national security engagements were destroyed as a result of the FBI's actions and inactions.
24. The emotional toll has been profound. The Plaintiff and his family members suffer from anxiety, distress, and loss of trust in government institutions.

**CLAIMS FOR RELIEF**

**COUNT I – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**

25. Plaintiff realleges paragraphs 1 through 24.
26. Plaintiff maintained active negotiations and contract development processes with senior officials at the Department of Defense, National Security Agency, the Department of Commerce, and others within the Intelligence Community, including leadership in the Bureau of Industry and Security at the Department of Commerce involving pilot programs and national security innovation collaborations scheduled for Q1 2024. These prospects included actioned pilot programs and other Cooperative Research and Development Agreements (CRADAs).
27. These engagements were abruptly terminated within 14 days of the FBI's raid and investigation.
28. FBI agents acted recklessly and in a manner that directly caused foreseeable harm to these relationships. Defendant's agents either knew or should have known about these government partnerships through open-source and classified channels, including public-facing materials and government interagency collaboration platforms.
29. This interference caused economic and reputational damage to Plaintiff.

**COUNT II – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**

30. Plaintiff realleges paragraphs 1 through 29.
31. Plaintiff had finalized NDAs, CRADAs, actioned pilot programs, Horizon 1 and 2 buy-in support from the Chief Technology Officer at the Department of the Navy (DON) and General Officers from the United States Marine Corps. These agreements contained specific terms for dual-use technology integration and interagency collaboration at the Service and enterprise-level for the DON.

32. These partnerships were cancelled following the government's intrusion. Direct references were made by partners to "pending federal matters" as justification for termination.
33. This conduct by the Defendant's agents constitutes intentional and improper disruption of legally binding agreements and formalized contractual relations.

**COUNT III – NEGLIGENCE**

34. Plaintiff realleges paragraphs 1 through 33.
35. FBI agents breached their duty of care under operational protocol, internal agency policy, and national security standards, including but not limited to the FBI Domestic Investigations and Operations Guide (DIOG), which requires coordination with subject matter experts and approval from higher headquarters before executing a search warrant.
36. Agents failed to coordinate with the FBI Headquarters, Cyber Division, CTO, or NCIJTF and ignored internal verification procedures.
37. This breach in duty of care directly and foreseeably caused reputational, economic, and psychological damage to Plaintiff.

**COUNT IV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

38. Plaintiff realleges paragraphs 1 through 37.
39. More than 15 FBI agents conducted a militarized pre-dawn raid at 6:00 AM, blocking off the roadways and driveway to their home, with rifles drawn, subjecting Plaintiff and his family to extreme psychological trauma.
40. At no point did agents explain the basis of their intrusion. During and after the raid, Plaintiff was subjected to hostile interrogation and public stigma wherein the local police department posted that an arrest had been made in the matter despite no charges ever being filed.
41. Plaintiff suffers from loss of community, persistent insomnia, distrust of law enforcement, and anxiety.
42. Defendant's conduct was extreme, outrageous, and beyond all bounds of decency, constituting intentional infliction of emotional distress.

**COUNT V – VIOLATION OF FIFTH AMENDMENT (CUSTODIAL INTERROGATION WITHOUT MIRANDA WARNINGS)**

43. Plaintiff realleges paragraphs 1-42.
44. On February 7, 2024, Plaintiff was detained inside his residence during a militarized pre-dawn raid executed jointly by the FBI's Boston and Baltimore Field Offices. More than fifteen (15) agents, some visibly armed, confined Plaintiff to his dining room and subjected him to sustained interrogation for over two (2) hours.

45. The environment was inherently coercive. Plaintiff's home was blocked off; law enforcement restricted movement inside and outside the premises. Plaintiff was not free to terminate the encounter or leave. Under controlling law, this constituted a custodial setting. See *Stansbury v. California*, 511 U.S. 318, 322 (1994) and *United States v. Hashime*, 734 F.3d 278, 283 (4th Cir. 2013).
46. Despite the custodial nature of the interaction, FBI agents did not advise Plaintiff of his constitutional rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), including the right to remain silent and the right to consult with counsel. The Supreme Court has made clear that *Miranda* warnings are required when a suspect is in custody and subject to interrogation, and that any statements obtained in violation of this rule are inadmissible. See also *Dickerson v. United States*, 530 U.S. 428, 444 (2000).
47. FBI agents engaged in express questioning regarding Plaintiff's professional activities, national security engagements, and proprietary cyber capabilities. These were incriminating inquiries within the meaning of *Rhode Island v. Innis*, 446 U.S. 291 (1980), and reasonably likely to elicit a self-incriminating response.
48. No Miranda warnings were ever provided before or during the prolonged in-home questioning. Plaintiff was denied the opportunity to consult with legal counsel and was not advised of his right to remain silent. This constitutes a categorical violation of the Fifth Amendment.
49. The FBI's failure to administer Miranda warnings, while conducting a custodial interrogation in Plaintiff's home, violated clearly established constitutional rights. These actions fall squarely within the framework of *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).
50. The deprivation of constitutional rights caused significant harm, including reputational destruction, psychological trauma, and the erosion of Plaintiff's trust in law enforcement and government institutions. There is no adequate remedy at law, as no charges were ever filed, no post-raid justification provided, and no internal accountability administered.
51. Plaintiff respectfully seeks compensatory damages under *Bivens*, injunctive relief, and formal acknowledgment of the constitutional violations detailed herein.

**COUNT VI – EQUAL PROTECTION VIOLATION UNDER THE FIFTH AMENDMENT**

52. Plaintiff realleges paragraphs 1 through 51.
53. Plaintiff alleges that FBI agents relied upon improper racial, ethnic, or national origin profiling in attributing foreign affiliations to his professional partners and clients, including collaboration with an Israeli-Australian national.
54. These assumptions were made without evidence and with no inquiry into Plaintiff's verified interagency clearance and affiliations.
55. This conduct violated Plaintiff's right to equal protection under the Due Process Clause of the Fifth Amendment.

**COUNT VII – UNLAWFUL DISCLOSURE OF CLASSIFIED INFORMATION**

56. Plaintiff realleges paragraphs 1 through 55.
57. FBI personnel or affiliates unlawfully disclosed information regarding a sealed national security investigation to unauthorized civilians prior to the February 7, 2024 raid, as early as August 2023.
58. These disclosures violated the Privacy Act, 5 U.S.C. § 552a, as well as internal FBI confidentiality and security policies, including restrictions under the Espionage Act.
59. Plaintiff received no authorization notice for these disclosures, which have contributed to irreparable reputational harm.

**COUNT VIII – PROMISSORY ESTOPPEL / DETRIMENTAL RELIANCE**

60. Plaintiff realleges paragraphs 1 through 59.
61. Plaintiff brings this equitable claim based on the United States government's repeated, specific, and actionable assurances—made through senior officials across multiple federal agencies—that induced Plaintiff to act in reasonable reliance, resulting in substantial and foreseeable harm.
62. Between 2021 and 2024, senior leadership within the FBI and other sanctioned departments of the United States Government provided direct and repeated affirmations of support for Plaintiff's company and its national security-focused technology solutions. These included, but were not limited to:
63. The Chief Technology Officer of the United States Navy's endorsement and intent to integrate Plaintiff's technology through Horizon 1 or Horizon 2 programs of record—valued at $15–$30 million annually;
64. Written confirmation from MARFORCYBER expressing commitment to invest in Plaintiff's solution for a Global Shaping Operation across all Combatant Commands;
65. A formal actioned pilot agreement with the Department of Commerce's Bureau of Industry and Security (BIS), valued at $850,000 for one month with a $10–12 million annual follow-on;
66. Prior vetting and endorsement of Plaintiff's platform by the FBI's Special Advisor to the Director for Cybersecurity and the Assistant Director for Counterterrorism, both of whom had full knowledge of the company's national security engagements.
67. In reliance upon these representations, Plaintiff took substantial action, including rejecting the employment offers from an Academy Award-winning Actor, expansion of operations, reallocation of personnel, strategic reprioritization of commercial opportunities, and direct investment into pilot readiness and compliance protocols.
68. These commitments were made with full awareness of their intended effect and with an expectation that Plaintiff would act upon them. The government agencies involved either knew or should have known that failure to honor or protect these assurances would result in foreseeable economic and reputational harm.

69. Following the unjustified and militarized FBI raid on February 7, 2024—executed without proper coordination, probable cause, or interagency verification—these institutional commitments were abandoned or rescinded. Partners cited "pending federal matters" as justification for termination. No charges were filed. No findings were produced. No due process was afforded.
70. As a direct result of his good faith reliance on official U.S. government representations, Plaintiff lost a minimum of over $50 million in documented commercial and federal partnership value, including a rescinded $2 million private investment tied to the unlawful disclosure of a classified investigation.
71. Equity demands redress. The doctrines of promissory estoppel and detrimental reliance apply to prevent injustice resulting from the government's failure to honor or correct the false premises upon which Plaintiff's actions were based.

**DAMAGES AND EQUITABLE RELIEF**

72. Plaintiff has suffered quantifiable and ongoing damages including but not limited to:
73. $42,475,000 in lost government contracts and investor commitments, including pilot programs, enterprise-wide acquisitions, and venture-backed deals.
74. $6,750,000 in reputational harm, based on the diminished professional valuation of Plaintiff's company, brand, and leadership standing.
75. $1,000,000 in emotional distress and mental health deterioration, supported by ongoing psychological counseling.
76. $4,625,000 in projected future earnings losses, based on employment contract base salary and bonuses, past compensation trends and lost professional trajectory.
77. Damages alone are insufficient to fully repair the personal, professional, and psychological injury sustained. Equitable relief is necessary to prevent continued harm.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Adam Wood respectfully requests that this Court:

A. Enter judgment in favor of Plaintiff and against Defendant on all counts;

B. Award Plaintiff compensatory damages in the amount of $54,850,000 or such amount proved at trial;

C. Permanent expungement of any internal DOJ or FBI record linked to the February 2024 raid;

D. Award equitable relief, including return of all seized property and a formal apology;

E. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

Adam Wood
302 Hibiscus Street
Taneytown, MD 21787
adamwood@alumni.harvard.edu
(717) 873-5101

**Dated:** April 1, 2025